73.    Interneuron and Wyeth Defendants failed to properly investigate the reports and failed

to warn doctors and consumers, including Plaintiffs, regarding the known risks of VHD

associated with use of the Diet Drugs. Interneuron and Wyeth Defendants also did not

adequately inform the FDA regarding the Belgian studies by suggesting that the reports were

irrelevant because some of the studied individuals had also ingested herbs which Interneuron and

Wyeth Defendants allegedly assumed caused VHD. In fact, Wyeth Defendants and Interneuron

only reported one Belgian case to the FDA involving Redux's ingredient dexfenfluramine in an

amendment to its Redux NDA.

74.    During the time fenfluramine was sold on the United States market and at the time

Interneuron filed its New Drug Application with the FDA for dexfenfluramine, Defendants had

available to it the information that its European counterpart sub-licensee Servier had accumulated

during its marketing of dexfenfluramine in Europe for over a decade concerning the safety and

efficacy of the dexfenfluramine, including medical literature, adverse event reports relating to the

use of the dexfenfluramine in Europe, clinical and other medical studies, and communications

from medical providers. This information which was known or should have been known by

Interneuron and Wyeth Defendants established inter alia, that:

a.    by 1977, Defendants knew or should have known that the mechanism of
       action of the Diet Drugs and their affects on serotonin were responsible for
       causing pulmonary hypertension in exposed patients, and knew or should have
       known that the same mechanism of action also was likely the same
       mechanism which caused heart valve disease in carcinoid patients;

b.    by 1992, Defendants knew or should have known that the Diet Drugs had been
       associated with fibrotic changes in the heart tissues of animals exposed to the
       drug;

c.    by February of 1994, Belgian physician Mariane Ewalenko, MD advised
       Servier of seven patients who had been taking the Diet Drugs and who were
       found suffering from valvulopathy;

d.    between 1994 and 1996, other Belgian physicians, including Jean Malak, MD
       and Jean-Francois Adam, MD, discussed and corresponded extensively with

27

Servier officials regarding numerous cases involving valvular regurgitation suffered by patients who had ingested the Diet Drugs;

e.  between 1994 and 1996, various Belgian doctors reported at least 30 cases of VHD associated with the use of the Diet Drugs;

f.  between 1994 and 1996, numerous adverse event reports were received by Interneuron and Wyeth Defendants which provided or should have provided notice of the association between ingestion of the Diet Drugs and VHD; and

g.  by 1995, available and reliable medical literature was available to Defendants from which Defendants' either knew or should have known that Diet Drugs caused an increase in circulating serotonin and that this very serotonin-related mechanism, also found in ergotamine toxicity and carcinoid syndrome, created a high risk for VHD.

75.  On April 2, 1996, just three weeks before Redux was approved for marketing in the United States, Dr. B. Taylor Thompson, of Massachusetts General Hospital and Harvard Medical School provided an analysis of 32 pulmonary hypertension cases, which were part of the November 1995 Safety Update, to the FDA and to Interneuron and Wyeth Defendants. The Thompson analysis concluded that of the 32 cases, sixteen (16) cases involved secondary pulmonary hypertension. Dr. Thompson specifically placed Interneuron and Wyeth Defendants on notice that VHD was one of the primary causes for the secondary hypertension. Interneuron and Wyeth Defendants did not update the November 1995 Safety Update, which would have put the public, the FDA, and plaintiffs' physicians on notice of the relationship between Diet Drugs and VHD.

76.  On April 29, 1996, the Defendants introduced the defective product Redux into the United States without informing the public, or Plaintiffs' physicians of the dangers and risks of VHD and secondary pulmonary hypertension associated with the Diet Drugs.

77.  On or about June 1, 1996, Interneuron entered into a "Co-promotion Agreement" with the Wyeth Defendants which both reaffirmed the joint venture or partnership between Interneuron and the Wyeth Defendants and provided for Interneuron to market, promote,

advertise, distribute, label, detail, supply, package and/or sell Redux in consideration for the payments from Interneuron's co-promoter, Wyeth Defendants, for percentages of profit derived from sales generated by Interneuron's sales representative sales force.

78.    On or about August 28, 1996, only four months after approval of Redux, Interneuron and Wyeth Defendants were provided and reviewed a study entitled "Cardiac Adverse Effects of Fenfluramine Isomers" prepared by Dr. Francis Wagniart of Servier revealing a higher incidence among Redux users of PH than was previously known. The findings further established Interneuron and Wyeth Defendants' knowledge of serious adverse side effects caused by the ingestion of the Diet Drugs. However, Interneuron and Wyeth Defendants failed to act responsibly in taking necessary action to protect the public, including Plaintiffs, from Diet Drug related injuries.

79.    In March 1997, the Defendants were informed by doctors of heart valve problems among users of the Diet Drugs when they received a detailed report from physicians in meetings at the Mayo Clinic in Rochester, Minnesota. However, Defendants failed to undertake any action to warn or otherwise prevent further injury to the consuming public including Plaintiffs.

80.    In July of 1997, the Mayo Clinic discovered additional cases of damage to heart valves caused by the Diet Drugs and made this additional information known to Defendants.

81.    On or about July 8, 1997, the Mayo Clinic in Rochester, Minnesota released an emergency report linking the use of the Diet Drugs to unusual, potentially life-threatening disease related to heart valves.

82.    Independent medical center data from the Mayo Clinic and elsewhere indicated that the Diet Drugs were associated with heart valve defects in as many as one-third of the patients who

used the drug. The Mayo Clinic study concluded that dexfenfluramine users needed to be informed about the risk of PH and VHD.

83.     Notwithstanding the fact that Interneuron and the Wyeth Defendants received detailed reports during separate meetings with investigators from the Mayo Clinic and the MeritCare Medical Center in Fargo, North Dakota regarding these findings as early as March of 1997, four months before the *New England Journal of Medicine* article reporting these findings was published, Interneuron and the Wyeth Defendants did not halt the wide spread use of the Diet Drugs until September of 1997.

84.     On July 8, 1997, the FDA issued a public health advisory regarding the use of the Diet Drugs which stopped the implementation of the DEA's administrative action relating to de-scheduling.

85.     On or about September 15, 1997, the FDA forced Defendants to withdraw the Diet Drugs from the United States market because the independent medical center data from the Mayo Clinic in Rochester, Minnesota, and elsewhere indicated that the Diet Drugs were associated with heart valve defects in as many as one-third of the patients who took the Diet Drugs alone or in combination with phentermine ("the initial Mayo study"). In fact, of 291 patients tested, one-third of them had damaged aortic or mitral heart valves; less than 1 percent of the general population has such damage.

86.     On November 11, 1997, results of a study funded by the National Institute of Health ("NIH"), of the association between heart valve abnormalities and the use of the Diet Drugs, individually or in combination with phentermine, were reported at the annual conference of the North America Association for the Study of Obesity in Cancun, Mexico. The study, conducted by investigators at the Hennepin County Medical Center in Minneapolis, Minnesota ("the

Hennepin study"), found significant heart valve leaks in 24% of 226 individuals taking one or more of these drugs.

87. Notably, the Hennepin study included a control or comparison group of 81 people matched by age, sex, height, and weight to the 226 cases. The 226 cases took fenfluramine and/or dexfenfluramine, while the 81 controls did not. Only 1% of the controls had significant heart valve leaks. All 307 individuals in the Hennepin study (cases and controls) had echocardiograms, which were read by physicians who were "blind" as to the status of each individual, i.e., the reading physicians had no knowledge as to whether the person had taken the diet drugs or not. The Hennepin study investigators found that dexfenfluramine ("Redux") is as likely to lead to heart valve defects as fenfluramine. Of the 226 patients observed in the Hennepin study, 145 had taken the combination of fenfluramine and phentermine, 40 had taken dexfenfluramine, 27 had taken dexfenfluramine in combination with phentermine, and 14 had taken all three drugs.

88. On November 13, 1997, officials from the FDA, NIH and the Centers for Disease Control issued a joint recommendation for medical monitoring of users of the Diet Drugs.

## General Allegations

89. At all times material hereto, Defendants researched, created, formulated, tested, developed, designed, licensed, assembled, compounded, manufactured, marketed, promoted, advertised, distributed, labeled, detailed, supplied, packaged and/or sold pharmaceutical Diet Drugs which were defective and unreasonably dangerous to consumers, including Plaintiffs.

90. Defendants knew or should have known that the Diet Drugs, when used alone or in combination with phentermine, created significant risks of serious injuries or disorders,

31

including VHD, secondary pulmonary hypertension, related cardiopulmonary dysfunction, cardiomyopathy, congestive heart failure, and/or death, as to which Defendants failed to make proper, reasonable or adequate warning to the public about the risks associated with the use of their products.

91. At all times material hereto, though Defendants knew or should have known that dangerous risks were associated with the use of the Diet Drugs, Defendants proceeded to or permitted the Diet Drugs to be assembled, compounded, manufactured, marketed, promoted, advertised, distributed, labeled, detailed, supplied, packaged and/or sold without adequate warnings of the serious side effects and dangerous risks.

92. Both during the initial submission of the Redux NDA and thereafter, Interneuron and the Wyeth Defendants did not adequately report to the FDA, the public, and Plaintiffs' physicians information in its possession which related directly the risk of developing valvular heart valve disease and pulmonary hypertension. The public, the FDA, the medical community and Plaintiffs, were misled by these actions and omissions, resulting in Plaintiffs having received no or inadequate warnings regarding the true risks associated with ingesting Redux.

93. Interneuron and Wyeth Defendants failed to conduct sufficient and adequate pre-marketing research and testing to properly determine the risks and severity of serious side effects including VHD and/or pulmonary hypertension caused by the ingestion of Diet Drugs which Interneuron and Wyeth Defendants knew or should have known about.

94. Interneuron and Wyeth Defendants failed to conduct sufficient and adequate post-marketing surveillance as to the ingestion of Diet Drugs and resultant adverse events and side effects to both properly determine and quantify the risks and severity of serious side effects and take reasonable and necessary remedial action to protect the public, including Plaintiffs, from

injuries being suffered by Diet Drug users which Interneuron and Wyeth Defendants knew or should have known about.

95.    Defendants failed to properly and adequately warn Plaintiffs, both directly and by and through Plaintiffs' prescribing physicians, of the dangers associated with Redux such that Plaintiffs' prescribing physicians did not have available to them the body of knowledge that an adequate warning from Interneuron would have communicated to Plaintiffs' prescribing physicians.

96.    As a result of Defendants' acts and omissions and other tortious conduct more fully detailed and alleged herein, Plaintiffs have sustained significant heart valve regurgitation and resultant injuries.

97.    Interneuron and Wyeth Defendants undertook a course of action and marketing strategy which included advertising and promotional campaigns to aggressively promote and sell the subject drugs.

98.    The product warnings in effect during the time the Diet Drugs were prescribed were non-existent or inadequate as to the need to alert prescribing physicians and consumer patients of the actual adverse health risks associated with these drugs, which risks were then known (or should have been known) to the Interneuron and Wyeth Defendants. Potential users were not informed about the products and the serious health effects which Interneuron and Wyeth Defendants knew or should have known could result from the use of the subject drugs.

99.    Wyeth Defendants and Interneuron, through their misrepresentations and omissions, created the impression and conveyed to Plaintiffs and others on whom Plaintiffs would rely, that the use of the Diet Drugs alone or in combination with phentermine was safe and had fewer adverse health and side effects than were actually associated with the Diet Drugs.

33

100. Interneuron and Wyeth Defendants undertook a promotional campaign that included the funding of and/or placement of numerous articles in scientific, medical and general interest magazines extolling the virtues of the Diet Drugs in order to induce widespread use of the products.

101. Interneuron and Wyeth Defendants actively encouraged, or failed to effectively discourage, the widespread prescribing of the Diet Drugs to patients that were not clinically obese.

102. Interneuron and Wyeth Defendants downplayed and understated the health hazards and risks associated with the Diet Drugs.

103. Interneuron and Wyeth Defendants failed to reveal relevant information to doctors and potential Diet Drug users including Plaintiffs and their physicians regarding the safety of the Diet Drugs.

104. Interneuron and Wyeth Defendants' through their product inserts and other documents, misrepresented a number of facts regarding the Diet Drugs, including the following:

   a) The presence of adequate testing of the Diet Drugs;
   b) Diet Drugs' efficacy including but not limited to the severity, frequency and discomfort of side effects and adverse health effects caused by the drugs;
   c) The relative risks associated with the Diet Drugs including the prevalence of pulmonary hypertension; and
   d) The relative risks associated with the Diet Drugs including the prevalence of VHD.

105. After learning of the extreme dangers associated with the Diet Drugs, Defendants did not adequately or appropriately provide information about the Diet Drugs or other relevant information to physicians in the United States, including Plaintiffs' physicians.

106. At all times relevant hereto, the Defendants' labeling on the Diet Drugs were totally inadequate to alert Plaintiffs, prescribing physicians and others of PH, VHD and/or secondary

34

pulmonary hypertension and other dangers and risks associated with Diet Drug usage. As a result, physicians have over-prescribed the Diet Drugs to patients who were under-informed regarding the risk of secondary pulmonary hypertension or VHD associated with the drugs.

107.  At all times relevant to this cause, Interneuron and Wyeth Defendants also knew or should have known of many other studies, regulatory actions and concerns, incidences of injury and/or death, concerns about the subject drugs, safety among scientists, researchers, regulators and other knowledgeable professionals, the dangers of drug combinations, meetings among pharmaceutical industry officers, executives or employees (including Defendants), internal memos and reports of health concerns regarding the subject drugs, the lack of sufficient safety studies before and during marketing of the subject drugs, the contents of Defendants' own files, plans and reports, the danger of the off-label use of medications, safety concerns about the drugs which could block or change FDA approval, regulatory actions, reports of injury and concerns about the subject drugs in Europe, case reports of pulmonary hypertension, regulatory efforts to make changes in the warning and labels required on these products and the plans and actions of Defendants to fight such changes, statements by medical professionals regarding safety concerns for the subject drugs, and adverse effects reported therefrom, the failure of Defendants to report incidences of PH resulting from the use of the subject drugs to regulators and health care professionals, the identification of groups most at risk of injury,  and many other material facts regarding the Diet Drugs which would have shown the danger and adverse health effect of using the subject drugs, but did not inform Plaintiffs, the public at large, or Plaintiffs' physicians of these material facts and risks.

108.  Defendants, having undertaken the manufacture, sale, marketing, distribution and promotion of the diet drugs described herein owed a duty to provide Plaintiffs, physicians, state

regulators and others upon whom it was known, or should have known, by Defendants that

Plaintiffs would rely, accurate and complete information regarding the subject drug products.

109.   Interneuron and Wyeth Defendants indicated to Plaintiffs, Plaintiffs' physicians,

regulators and others upon whom it was known, or should have been known that each Plaintiff

would rely, that the Diet Drugs were safe and effective, that the benefits of taking the subject

drugs outweighed any risks and provided inaccurate safety and effectiveness information

regarding its products including but not limited to the propensity to cause serious physical harm.

The continuous and ongoing course of action started as early as 1993, if not earlier, and

continued through repeated acts and non-disclosure every year since then, in the State of

Massachusetts and in those States in which the Plaintiffs resided, were prescribed and ingested

the Diet Drugs, throughout the United States, and elsewhere.

110.   Interneuron's and Wyeth Defendants' fraudulent misrepresentations took the form of,

among other forms, express and implied statements, publicly disseminated misinformation,

misinformation provided to regulatory agencies, inadequate, incomplete and misleading

warnings about the subject products, failure to disclose important safety and injury information

regarding the products while having a duty to disclose to Plaintiffs and others such information,

and elaborate marketing, promotional, and advertising activities.

111.   The Diet Drugs were in fact unsafe, and the use of the Diet Drugs posed an

unreasonable risk of injury and death that outweighed the purported benefits of their use, such

that injury was in fact caused to Plaintiffs and others.

112.   Defendants, individually and jointly, failed to adequately warn Plaintiffs and those

whom they knew Plaintiffs would rely of the hazards associated with the use of the Diet Drugs

36

and failed to provide this knowledge from Plaintiffs and others. As a result of this failure to

warn, Plaintiffs were caused to suffer injuries and damages.

113.  The Diet Drugs were defective and unreasonably dangerous when they left the

possession of Defendants in that, among other ways:

> a.  the Diet Drugs caused injury to the user far beyond any warned, noticed, expected or reasonable side effect or adverse reaction and when placed in the stream of commerce they contained unreasonably dangerous defects subjecting Plaintiffs to risks from expected or known usage, including bodily injury and death, which exceeded the benefits of the subject drugs;
>
> a.  when placed in the stream of commerce the Diet Drugs were defective in design and formulation, making use of the drugs more dangerous than an ordinary consumer would expect and more dangerous than other risks associated with obesity and weight loss;
>
> b.  the Diet Drugs contained insufficient and/or ineffective warnings to alert consumers and users to the risks of injury and death by VHD and PH;
>
> c.  the Diet Drugs were insufficiently tested;
>
> d.  there were insufficient instructions on the proper use of the Diet Drugs;
>
> e.  there were inadequate post-marketing warnings or instructions because, after Defendants knew or should have known of the significant risks previously described, Defendants failed to provide adequate warnings to users and consumers, and/or their physicians, and continued to promote the sale and use of the subject drugs;
>
> f.  the Diet Drugs had not been materially altered or modified prior to the use of said drugs by Plaintiff; and
>
> g.  Defendants were in the business of distributing and selling the Diet Drugs which make the basis of this lawsuit.

114.  Defendants assembled, compounded, manufactured, marketed, promoted, advertised,

distributed, labeled, detailed, supplied, packaged and/or sold these products in a defective

condition that was unreasonably dangerous to the user or ultimate consumer of this product.

Each product was expected to and did reach the user and consumer Plaintiffs without substantial

change in the condition at which it was sold.

115.  As a direct and legal result of the defective condition of the Diet Drugs, Plaintiffs

sustained and will continue to sustain serious and permanent injuries, physical pain and

suffering, impairment, disability, disfigurement, mental anguish, loss of capacity for the

enjoyment of life past and future; undergoing medical monitoring; loss of earnings and loss of

the ability to earn money in the past and the future; expense of hospitalization, medical and

nursing care and treatment and medical monitoring in the past and in the future; and fear and

mental anguish concerning future medical problems associated with their injuries.

116. Defendants, Interneruon and Wyeth Defendants, employed, contracted, associated or

otherwise engaged pharmaceutical sales persons, area account mangers, district managers, area

development managers, area business directors and other representatives ("sales

representatives") in furtherance of marketing, promoting, selling and/or distributing the Diet

Drugs through the United States. Interneuron and Wyeth Defendants, by and through these sales

representatives, provided inaccurate information or failed to provide information relating to the

dangers associated with the Diet Drugs, to the consuming public, including Plaintiffs and

Plaintiffs' prescribing physicians. During the course of their employment or other engagement

with Interneuron and Wyeth Defendants, the sales representatives undertook the following both

within the scope of their employment and at the instruction and/or direction of Interneuron and

Wyeth Defendants: failed to convey adequate warnings to Plaintiffs through their prescribing

physicians; negligently distributed, marketed, advertised and/or promoted the Diet Drugs; made

negligent misrepresentations regarding the safety and efficacy of the Diet Drugs; negligently

failed to provide sufficient instructions to Plaintiffs and/or their prescribing physicians regarding

the use of said drugs; made misrepresentations to physicians and staff, with the intent that these

statements be relied upon to the detriment of patients, including Plaintiffs, including but not

limited to: that the Diet Drugs were safe and effective when used as directed, and that the Diet

Drugs were effective for long term weight loss. Moreover, Interneuron and Wyeth Defendants,

by and through their sales representatives did not relay the true risk of serious cardiovascular and

life threatening diseases such as VHD and PH.. Upon information and belief, these sales

representative, armed with Plaintiffs' doctors' profile consisting of personal biographical

information and periodic reports on prescribing habits, specifically discussed the importance of

co-promotion of the Diet Drugs within the Interneuron and Wyeth Defendant network and with

other companies and, in a coordinated fashion, implemented those discussions and agreements

by bombarding prescribing physicians, including Plaintiffs' physicians, with misleading

information about the Diet Drugs.   As a result of the tortious actions described herein by

Defendants, Interneruon's and Wyeth Defendants' sales representative agents, Interneuron and

Wyeth Defendants are liable to Plaintiffs in strict products liability, negligence, fraudulent

misrepresentation, fraudulent concealment, and unfair and deceptive trade practices, as well as

those other actions pled in this complaint.

117.  Plaintiffs were prescribed the Diet Drugs for weight loss.  Plaintiffs received no

warnings or statements regarding adverse effects of Diet Drug use which would warn Plaintiffs

against the use of such Diet Drugs or that such Diet Drugs could cause VHD and associated

injuries suffered by Plaintiffs.

**COUNT I -Breach of Warranty**
**DEFECTIVE DESIGN**

118.  Plaintiffs adopt by reference all of the allegations above, each inclusive, as though fully

set forth herein.

119.  At all times material hereto, Defendants engaged in the business of researching,

formulating, testing, developing, designing, licensing, assembling, compounding, marketing,

promoting, distributing, detailing, and/or selling the Diet Drugs that were defective and unreasonably dangerous to consumers, including Plaintiffs.

120.  At all times material hereto, the Diet Drugs which were researched, formulated, tested, developed, designed, licensed, assembled, compounded, marketed, promoted, distributed, detailed, and/or sold by Defendants were expected to reach, and did reach, prescribing physicians and consumers including Plaintiffs, without substantial change in the condition in which they were sold.

121.  At all times material hereto, the Diet Drugs were in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

    a.    When placed in the stream of commerce, the Diet Drugs contained unreasonably dangerous design defects and was not reasonably safe as intended to be used, subjecting Plaintiffs to risks which exceeded the benefits of the drug;

    b.    When placed in the stream of commerce, Diet Drugs were defective in design and formulation, making use of the drug more dangerous than an ordinary consumer would expect and more dangerous than other risks associated with obesity and/or weight loss;

    c.    Diet Drugs were insufficiently tested;

    d.    The intended use of the drugs caused harmful side effects which outweighed any potential utility; and

    e.    Diet Drugs were not safe for its intended use as a weight loss drug.

122.  But for the aforementioned defective and unreasonably dangerous conditions, the Diet Drugs would not have been prescribed to Plaintiffs, Plaintiffs would not have ingested the drugs, and Plaintiffs would not have sustained the injuries alleged herein.

123.  As a direct and legal result of the defective condition of the Diet Drugs, Plaintiffs have sustained serious and permanent injuries including, but not limited to, injuries to the heart, pulmonary system and/or other related injuries, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and/or nursing care and

treatment, loss of earnings and loss of the ability to earn money in the future. Plaintiffs' injuries and losses are continuing in nature.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, as well as all costs of this action.

## COUNT II – Breach of Warranty
## FAILURE TO WARN

124.  Plaintiffs adopt by reference all of the allegations above, each inclusive, as though fully set forth herein.

125.  Diet Drugs were defective and unreasonably dangerous when it left the possession of Defendants in that Diet Drugs contained warnings which were misleading regarding the purported benefits associated with the drug and were inadequate and insufficient to alert physicians and consumers, such as Plaintiffs, to the dangerous risks and reactions associated with the drugs, including, but not limited to, pulmonary hypertension, heart valve disorders, and other serious and life threatening side affects, especially since any weight loss experienced was transitory. Plaintiffs' injuries and losses are continuing in nature.

126.  The physicians prescribed the Diet Drugs to Plaintiffs for the intended purpose.

127.  Neither the prescribing physicians nor Plaintiffs could have discovered any defect in the drug through the exercise of reasonable care.

128.  Defendants are held to the level of knowledge of an expert in the field.

129.  The prescribing physicians did not have substantially the same knowledge as an adequate warning from the manufacturer or distributor should have communicated to the prescribing physicians.

41

130. The warnings that were given by Defendants to the prescribing physicians were not adequate, accurate, or clear, and were ambiguous.

131. The limited warnings which were provided to the doctors were inappropriately placed in the fine print of the materials provided to the prescribing physicians, and Defendants failed to display those warnings prominently enough such that prescribing physicians and the consuming public would appreciate the true risks of severe and life threatening complications which had been reported in association with Diet Drugs, including, but not limited to, the pulmonary hypertension and VHD.

132. Defendants had a continuing duty to warn the prescribing physicians and Plaintiffs of the dangers associated with the Diet Drugs.

133. As a direct and legal result of Defendants' failure to warn, Plaintiffs have sustained serious and permanent injuries including, but not limited to, injuries to the heart, pulmonary system and/or other physical injuries, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings and loss of the ability to earn money in the future. Plaintiffs' injuries and losses are continuing in nature. WHEREFORE, Plaintiffs demand judgment against Defendants for damages, as well as all costs of this action.

## COUNT III
## NEGLIGENCE

134. Plaintiffs adopt by reference all of the allegations above, each inclusive, as though fully set forth herein.

135. Defendants directly or indirectly, negligently and/or defectively made, created, formulated, tested, developed, designed, licensed, assembled, compounded, manufactured, marketed, promoted,

advertised, distributed, labeled, detailed, supplied, packaged and/or sold the Diet Drugs throughout

the United States.

136.   At all times material hereto, Defendants had a duty to Plaintiffs to exercise reasonable care

in the researching, formulating, testing, developing, designing, licensing, assembling, compounding,

marketing, promoting, distributing, detailing, and/or selling of Diet Drugs.

137.   Defendants breached that duty and was negligent in its actions and omissions toward

Plaintiffs and their prescribing physicians in ways which include, but are not limited to, the

following:

    a.  Failure to include adequate warnings with the drugs that would alert
physicians to the potential risks and serious side affects of the drug;

    b.  Failure to adequately and properly test the drug before placing the drugs on
the market;

    c.  Failure to conduct sufficient testing of the drugs which, if properly
performed, would have shown that the drug had serious side effects,
including, but not limited to,  pulmonary hypertension and heart valve
disorders;

    d.  Failure to adequately warn Plaintiffs' prescribing physicians that use of the
drugs should be accompanied by a professional examination and regularly
scheduled follow-up examinations so that  pulmonary hypertension, heart
valve disorders and other serious side effects could be avoided or detected
early;

    e.  Failure to adequately warn Plaintiffs' prescribing physicians that use of the
drugs carried a risk of pulmonary hypertension, VHD, and other serious side
effects;

    f.  Failure to adequately warn Plaintiffs' prescribing physicians that use of the
drugs carried a risk of temporary or permanent disability due to  pulmonary
hypertension, VHD, and other serious side effects

    g.  Failure to warn Plaintiffs' prescribing physicians that use of the drug carried a
risk that heart surgery might become necessary to repair or replace heart
valves damaged by the drug;

    h.  Failure to provide adequate post-marketing warnings or instructions after
Defendants knew or should have known of the significant risks of pulmonary
and/or VHD and/or cardiovascular injury from the use of the drug;

    i.  Failure to adequately warn Plaintiffs' prescribing physicians that the drug
should not be prescribed for a long period of time or for use in conjunction
with other weight loss drugs;

j.  Failure to warn the prescribing doctors that the use of the drug should be limited to those who specialized in the treatment of obesity;

k.  Failure to warn Plaintiffs' prescribing doctors that use of the drug should be limited to the morbidly obese and not used for cosmetic loss of weight;

l.  Failure to warn Plaintiffs' prescribing doctors that the drug would not substantially reduce weight or reduce weight for a long period of time;

m.  Failure to warn Plaintiffs' prescribing doctors that the use of the drug had not been properly studied as to safety in animals or humans; and

n.  Failure to display the warnings that were provided in a manner which would properly alert the prescribing doctors as to the seriousness of the adverse events which had been reported in association with the drug.

138.  Defendants knew or should have known that Diet Drugs caused unreasonably dangerous risks and serious side effects of which Plaintiffs and the prescribing physicians would not be aware.

139.  But for Defendants' negligent conduct as described herein, Plaintiffs' prescribing physicians would have never prescribed Diet Drugs to Plaintiffs, Plaintiffs would not have ingested Diet Drugs and Plaintiffs would not have suffered harm from ingesting Diet Drugs.

140.  As a direct and legal result of the negligence of Defendants, Plaintiffs have sustained serious and permanent injuries including, but not limited to, injuries to the heart, pulmonary system and/or other physical injuries; disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings and loss of the ability to earn money in the future.  Plaintiffs' injuries and losses are continuing in nature.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, as well as all costs of this action.

**COUNT IV**
**FRAUDULENT/NEGLIGENT MISREPRESENTATION**

141.  Plaintiffs adopt by reference all of the allegations above, each inclusive, as though fully set forth herein.

142.  Defendants, having undertaken the manufacturing, marketing, prescription dispensing, distributing and promotion of Diet Drugs owed a duty to provide complete and accurate information regarding the drug to Plaintiffs, their physicians, and anyone else Defendants knew or should have known would ingest or prescribe the drug.

143.  Defendants misrepresented material facts regarding the safety and efficacy of the Diet Drugs, and failed to inform Plaintiffs, the public and Plaintiffs' prescribing physicians these material facts.

144.  Defendants fraudulently and/or negligently misrepresented to Plaintiffs, Plaintiffs' physicians, the FDA, and the general public that Diet Drugs were safe and effective, that the benefits of taking the drug outweighed any risks, and/or fraudulently and/or negligently misrepresented and concealed safety and effectiveness information regarding the product, including but not limited to the drug's propensity to cause serious physical harm. The continuous and ongoing course of action constituting fraudulent and/or negligent misrepresentation on Plaintiffs started as early as 1992, if not earlier, and continued through repeated acts and non-disclosure every year since then throughout the United States and elsewhere.

145.  Diet Drugs were in fact unsafe and the use of Diet Drugs posed a risk of injury and death which outweighed the purported benefits of its use, such that injury was in fact caused to Plaintiffs and others.

146.  Defendants made fraudulent and/or negligent misrepresentations regarding adverse information at a time when it knew, or should have known, that Diet Drugs had defects, dangers, and characteristics that were other than what Defendants had represented to the prescribing doctors or other dispensing entities, the FDA, and the consuming public, including Plaintiffs.  Specifically, Defendants misrepresented the following:

a.   It was dangerous to prescribe the Diet Drugs;

b.   Diet Drugs were not intended for cosmetic weight-loss;

c.   The Diet Drugs carried risks of serious adverse effects;

d.   After discontinuing use, most users of the Diet Drugs would regain any weight lost as a result of its use;

e.   There had been insufficient studies regarding the safety and efficacy of the Diet Drugs for use in treating weight loss;

f.   That prior studies, research, reports and/or testing had been conducted linking the use of the drug or similar drugs, to serious adverse reactions, including, but not limited to, pulmonary hypertension, and VHD;

g.   The fact Defendants knew, or should have known of twenty-five (25) cases of heart-valve damage reported in Belgium and/or elsewhere in Europe related to the drug or similar drugs;

h.   The fact that Defendants knew or should have known of the greatly increased risk of developing pulmonary hypertension, as well as a great number of reports of the disorder related to the drugs' use;

i.   the known number of cases reported to Defendants of persons who had contracted pulmonary hypertension after ingesting Diet Drugs;

j.   The results of studies on animals, which revealed marked abnormalities in the cardiac and/or pulmonary tissues of these animals following diet drug ingestion;

k.   The safety and efficacy of Diet Drugs in labeling, advertising, product inserts, and other materials;

l.   The number of deaths that had been associated with Diet Drugs, the number of cases of heart valve damage associated with the drug, the number of cases of pulmonary hypertension associated with the drug, and the fact that the drug had been associated with pulmonary hypertension and VHD;

m.   That the Diet Drugs were less effective than a placebo in achieving their intended purpose; and

n.   The nature and extent of any beneficial health effect the Diet Drugs would provide the user.

147.  The misrepresentations alleged above were perpetuated directly and indirectly by the Defendants.

148.  The fraudulent and/or negligent misrepresentations of Defendants took the form of, among other things, express and implied statements, publicly disseminated misinformation, misinformation provided to regulatory agencies, inadequate, incomplete and misleading warnings about the subject products, failure to disclose important safety and injury information regarding the products while having a duty to disclose to Plaintiffs and others such information.

149. Defendants knew or should have known that these representations were misleading at the time they were made or omitted, and made the representations with the intent or purpose that Plaintiffs and Plaintiffs' physicians would rely on them, leading to the use of the Diet Drugs by Plaintiffs.

150. At the time of Defendants' fraudulent and/or negligent misrepresentations, Plaintiffs and Plaintiffs' physicians were unaware of the inaccuracy of the statements being made and believed them to be true.

151. Plaintiffs' physicians and Plaintiffs justifiably relied on and were induced by the misrepresentations and relied on the absence of adverse safety information in the prescription and ingestion of the Diet Drugs.

152. Defendants had a post-sale duty to warn Plaintiffs and or Plaintiffs' physicians about the potential risks and complications associated with Diet Drugs in a timely manner.

153. The misrepresentations by Defendants constitute a continuing tort.

154. Defendants made the statements and/or omissions with the intention that Plaintiffs, Plaintiffs' prescribing physicians or other dispensing entities and the consuming public would rely on such or the absence of such information in selecting Diet Drugs as a treatment for weight loss.

155. As a direct and legal result of the fraudulent and/or negligent misrepresentations of Defendants, Plaintiffs have sustained serious and permanent injuries including, but not limited to, injuries to the heart, pulmonary system and/or other physical injuries, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of the ability to earn money in the future. Plaintiffs' injuries and losses are continuing in nature.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, as well as all costs of this action.

## COUNT V
## FRAUDULENT CONCEALMENT
## (AGAINST DEFENDANT INTERNEURON ONLY)

156. Plaintiffs adopt by reference all of the allegations above, each inclusive, as though fully set forth herein.

157. To date, even in light of the existence of overwhelming scientific proof in the form of countless epidemiologic studies and other tests and/or studies, Defendant, Interneruon, still claims that "[b]ased on the results of studies to date, the incidence of cardiac valve abnormalities has been shown to be less than that suggested by the original FDA preliminary analysis. In general, these studies have shown either no or relatively small differences, although in some cases statistically significant, between the incidence of cardiac valve abnormalities, as defined by the FDA, among patients who took Redux and placebo-treated patients and that the incidence of such abnormalities among Redux patients was less than previously reported estimate."

158. Furthermore, in response to law suits which have been brought against Interneuron by shareholders claiming that Interneuron misled shareholders and committed securities fraud relating to its actions associated with the approval and subsequent marketing of Redux, Interneuron has plainly yet fallaciously stated that it did not conceal known risks regarding Redux, and it has uniformly denied the causal link between Redux ingestion and the injuries referenced herein.

159. Interneuron, having undertaken the manufacturing, marketing, prescription dispensing, distributing and promotion of Redux owed a duty to provide complete and accurate information regarding the drug to Plaintiffs, their physicians, and anyone else it knew or should have known would ingest or prescribe Redux.

48

160. Interneuron has misrepresented material facts regarding the safety and efficacy the diet drug, and failed to inform Plaintiffs, the public and Plaintiffs' prescribing physicians these material facts, to this day.

161. The continuous and ongoing course of action constituting fraudulent concealment on Plaintiffs started as early as 1992, if not earlier, and continued through repeated acts and non-disclosure every year since then throughout the United States and elsewhere.

162. Interneuron actively concealed adverse information at a time when it knew, or should have known, that Redux had defects, dangers, and characteristics that were other than what it knew or should have known existed regarding the dangerous side effects associated with Redux.

163. The active concealment alleged were perpetuated directly and indirectly by Interneuron, and took the form of, among other things, express and implied statements, publicly disseminated misinformation, misinformation provided to regulatory agencies, inadequate, incomplete and misleading warnings about the subject products, and a campaign of misinformation intended to convince Plaintiffs, Plaintiffs prescribing physicians, and the public that Redux is not associated with VHD or PH, and is in fact a safe and effective product.

164. Interneuron knew or should have known that these representations were false or misleading at the time they were made or omitted or concealed, and made the representations with the intent or purpose that Plaintiffs and Plaintiffs' physicians would rely on them, leading to the use of Redux by Plaintiffs, and with the specific intention that Plaintiffs rely on such misrepresentations and concealment by delaying in obtaining appropriate medical care and monitoring, in discovering their injuries associated with the use of Redux, and in discovering that such injuries were caused by the acts and omissions of Interneuron.

49

165. Plaintiffs and Plaintiffs' physicians had no knowledge of the information concealed and suppressed by Defendants and were unaware of the inaccuracy of any statements being made and believed them to be true.

166. Plaintiffs and Plaintiffs' physicians justifiably relied on and were induced by Interneuron's active concealment and relied on such actions, statements, and omissions.

167. Interneuron had a post-sale duty to warn Plaintiffs and or Plaintiffs' physicians about the potential risks and complications associated with Redux in a timely manner.

168. The misrepresentations and active concealment by Interneuron constitutes a continuing tort.

169. Such concealment has served to toll any applicable statute of limitations that applies to Plaintiffs' claims against Interneuron. As a direct result of the concealment, and their justified reliance thereon, Plaintiffs did not and could not have discovered their injuries caused by the ingestion of Redux, until they received an echocardiogram which indicated the presence of FDA positive valvular heart disease and did not and could not have discovered that such injury was caused by the acts and omissions of Interneuron or their ingestion of Redux..

170. As a direct and legal result of the fraudulent concealment by Interneuron, Plaintiffs have sustained serious and permanent injuries including, but not limited to, injuries to the heart, pulmonary system and/or other physical injuries, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of the ability to earn money in the future. Plaintiffs' injuries and losses are continuing in nature.

WHEREFORE, Plaintiffs demand judgment against Defendants Interneuron for damages, as well as all costs of this action.

## COUNT VI
## G.L. c. 93A UNFAIR AND DECEPTIVE PRACTICES
## (AGAINST DEFENDANTS INTERNEURON AND BOEHRINGER ONLY)

171.   Plaintiffs adopt by reference all of the allegations above, each inclusive, as though fully set forth herein.

172.   Defendants Interneuron and Boehringer were at all times material hereto engaged in the conduct of trade and commerce throughout the United States including the Commonwealth of Massachusetts and the States within which Plaintiffs were prescribed and ingested Redux.

173.   Defendants Interneuron and Boehringer engaged in trade and commerce with respect to the design, manufacture, approval, marketing, promotion, distribution and sale of Redux, a defective product, which was unfit for its intended use, and which had risks that substantially outweighed any benefits.

174.   Defendants Interneuron and Boehringer, in furtherance of their business of trade and commerce, did knowingly and willfully fail to disclose to Plaintiffs individually and by and through their physicians information about the risks associated with the ingestion of Redux.

175.   Interneuron and Boehringer made misleading statements and failed to disclose information to Plaintiffs individually and by and through their physicians concerning Redux in its marketing, promotion, distribution, and sale.

176.   Interneuron and Boehringer knew the facts concerning Redux were material to Plaintiffs and their physicians in assessing the safety of Redux.  Defendants also knew that withholding this information would place Plaintiffs at further risk of injury.

177.   Interneuron and Boehringer made these misrepresentations and failed to disclose material facts for the purpose of inducing Plaintiffs to purchase and ingest Redux.

178. Plaintiffs relied to their detriment on Interneuron's and Boehringer's representations that Redux was an effective and relatively risk free diet drug.

179. As a result of their reliance and as a direct and proximate cause of Interneuron's and Boehringer's willful or knowing unfair or deceptive acts or practices in violation of G.L. c. 93A, § 2, Plaintiffs have sustained serious and permanent injuries including, but not limited to, injuries to the heart, pulmonary system and/or other physical injuries, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of the ability to earn money in the future. Plaintiffs' injuries and losses are continuing in nature.

180. Interneuron's and Boehringer's violation of G.L. c. 93A, § 2 entitles Plaintiffs individually to an award of actual damages and reasonable attorney's fees and costs incurred in connection with said action.

181. Interneuron's and Boehringer's actions which resulted in their failure to provide accurate and sufficient information about the true risks of pulmonary hypertension, VHD and other injuries constitute unfair and deceptive acts and practices as defined in G.L. c. 93A.

182. Defendants knowingly and willfully engaged in these unfair and deceptive acts and practices in violation of G.L. c. 93A, § 2, entitling Plaintiffs to an award of up to treble but not less than double damages against Defendants Interneuron and Boehringer.

183. Defendants' unfair and deceptive acts and practices occurred primarily and substantially within Massachusetts because, among other things: Defendants' principal place of business is in Lexington, Massachusetts and at all relevant times Defendants and its officials were conducting business in Massachusetts when they engaged in unfair and deceptive acts and practices; and

Defendants committed said unfair and deceptive acts in marketing, promoting, packaging, labeling, compounding, distributing, detailing, and/or selling Redux to the public, including Plaintiffs.

184.   Plaintiffs have substantially complied and/or will comply with all requirements of G.L. c. 93A , § 9.

185.   Plaintiffs have pursuant to Massachusetts G.L. c. 93A sent Interneuron and Boehringer a letter of demand for settlement.

WHEREFORE, Plaintiffs demand judgment against Defendants Interneuron and Boehringer for damages, including actual damages, which Plaintiffs request to be trebled or doubled by the Court, as well as reasonable attorney's fees and costs incurred in connection with this action, and any other relief this Court deems proper.

PLAINTIFFS CLAIM A TRIAL BY JURY.

_____

Edward J. Barshak, (BBO No. 032040)
Michael S. Appel, (BBO No. 543898)
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street, 9th Floor
Boston, MA 02114
(617) 227-3030

Robert J. Morris, Esquire
Morris & McAnnally, LLC
10365 Holtville Road
P.O. Box 220406
Deatsville, AL 36022
(334) 569-1820

DATED: May 6 , 2004

53

# COMMONWEALTH OF MASSACHUSETTS

EASTERN COUNTIES, SS.
MIDDLESEX, SS.

SUPERIOR COURT

**0 F-1926**

| |
|---|
| **IN RE MASSACHUSETTS STATE COURT DIET DRUG LITIGATION** |
| **Staci Putman and Michelle Thaxton,**<br><br>        Plaintiffs<br><br>v.<br><br>**Indevus Pharmaceuticals, Inc., F/K/A Interneuron Pharmaceuticals, Inc.; Wyeth, Inc., F/K/A American Home Products Corporation; Wyeth Pharmaceuticals, Inc F/K/A Wyeth-Ayerst Pharmaceuticals, Inc., A Division Of American Home Products Corporation; and Boehringer Ingelheim Pharmaceuticals, Inc.,**<br><br>        Defendants |

Civil Action
No. 00-9999-G



FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
FOR THE COUNTY OF MIDDLESEX

MAY 06 2004

CLERK

## MOTION FOR APPOINTMENT
## OF SPECIAL PROCESS SERVER

    Now come the plaintiffs in the above-captioned matter and move that this Court

appoint Constables Philip D. Fixman, Michael B. Fixman and Daniel P. Kochakian of

Michael B. Fixman & Associates (disinterested parties and over the age of eighteen), 72

Hancock Street, P.O. Box 83, Everett, Massachusetts or a representative thereof, as

Special Process Server, for the purpose of serving any and all process served in this case,

including but not limited to the Complaint.

*2004 May 6 (Locke, J.)*
*Motion allowed*
*Patricia A. McCann*
*Deputy Asst. Clerk*

Edward J. Barshak, (BBO No. 032040)
Michael S. Appel, (BBO No. 543898)
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street, 9th Floor
Boston, MA 02114
(617) 227-3030

Robert J. Morris, Esquire
Morris & McAnnally, LLC
10365 Holtville Road
P.O. Box 220406
Deatsville, AL 36022
(334) 569-1820

DATED: May 6 , 2004